IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JAMES B. TWISDALE,

      Plaintiff,

v.                        Case No. 2:04-cv-00986

HENRY M. PAULSON, Secretary of the
United States Department of the Treasury,

      Defendant.


## PROPOSED FINDINGS AND RECOMMENDATION

Pending is Defendant's Motion for Summary Judgment (docket sheet document # 57).  This matter was referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

## PROCEDURAL HISTORY

On September 10, 2004, Plaintiff, who is an employee of the Internal Revenue Service (the "IRS"), instituted this civil action against the Secretary of the United States Department of the Treasury under Title VII of the Civil Rights Act of 1964, as amended (hereinafter "Title VII").  On December 14, 2004, Plaintiff was permitted to file an Amended Complaint, in order to include a prayer for relief.  (# 12).

On January 28, 2005, Defendant filed a Motion to Dismiss, or in the alternative, Motion for Summary Judgment (# 14) and a Memorandum of Law in support thereof (# 15).  On March 24, 2005, Plaintiff filed a response in opposition to Defendant's motion (# 20) and, on April 8, 2005, Defendant filed his reply (# 21).

On August 17, 2005, the undersigned submitted a Proposed Findings and Recommendation ("PF&R") (# 22), proposing that the presiding District Judge find that an employer's delay in processing grievances may constitute an adverse employment action and, thus, Plaintiff had set forth a prima facie case of retaliation with regard to his claim that Defendant delayed processing five agency grievances filed by Plaintiff in retaliation for Plaintiff's prior Equal Employment Opportunity ("EEO") activity.  Accordingly, the undersigned recommended that Defendant's Motion to Dismiss, or in the alternative, Motion for Summary Judgment, be denied as to that claim.  (Id.)

The undersigned further proposed that the presiding District Judge find that Plaintiff had failed to exhaust his administrative remedies concerning his retaliation claim related to his 2002 performance evaluation and bonus, and that his Amended Complaint failed to state a claim of a hostile work environment under Title VII.  Accordingly, the undersigned recommended that those claims be dismissed.  (Id.)

2

Defendant filed objections to the PF&R, asserting that Plaintiff failed to allege facts to support a finding that he had suffered an adverse employment action. (# 27). On August 2, 2006, the presiding District Judge entered a Memorandum Opinion and Order adopting the undersigned's PF&R "except to the extent that the magistrate judge found it necessary that plaintiff describe an adverse employment action," and dismissing all of Plaintiff's claims, except the retaliation claim concerning the delay in resolving Plaintiff's grievances. (# 34 at 9-10).

In finding that Plaintiff's retaliation claim could go forward, the District Court cited the United States Supreme Court's recent ruling in Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006). Based upon Burlington Northern, the presiding District Judge found:

> The United States Supreme Court quite recently held that the anti-retaliation provision is not "coterminous" with Title VII's substantive anti-discrimination provision and that it "extends beyond workplace-related or employment-related retaliatory acts and harm." Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2414 (2006). It is not, therefore, necessary to point to an adverse employment action to support a claim for retaliation [footnote omitted]. To prove actionable retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 2415, citations omitted.

(# 34 at 7). The presiding District Judge's Memorandum Opinion and Order further states:

3

Plaintiff's contentions would appear to describe actions of delay by his employer that a reasonable person would find "materially adverse". An employer's purposeful allowance of the languishing, over an unusually extended period of time, of an employee's grievance may likely be an exploitation of the exhaustion requirement that effectively renders the employee's administrative remedy unavailable, thereby producing significant injury or harm.

(Id. at 9).

On April 23, 2007, after the conclusion of the discovery period, Defendant filed the instant Motion for Summary Judgment (# 57) and a Memorandum of Law in support thereof. (# 58). On May 4, 2007, Plaintiff filed a Response to the Motion for Summary Judgment. (# 59). On May 29, 2007, Defendant filed a Reply brief. (# 64).

On June 8, 2007, Plaintiff filed a Motion to Include a Sworn Affidavit in support of his Response, with the affidavit attached. (# 65). That motion was granted by the undersigned on August 21, 2007. On August 24, 2007, the undersigned ordered that certain pages from the EEO investigative file of Plaintiff's Agency Case No. TD 01-3224 be made a part of the record. (# 67). Plaintiff cited these pages in support of the allegations made in his Amended Complaint (# 12) and his Response to Defendant's Motion for Summary Judgement (# 59), and the undersigned found that the inclusion of these pages in the court record would be helpful to the determination of Defendant's Motion for Summary Judgment. Those documents may be found in docket # 68.

4

## STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings and evidence of record show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

The non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." Id. at 252. Likewise, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).

5

## STATEMENT OF UNDISPUTED MATERIAL FACTS

As discussed previously, Plaintiff works for the IRS as a Territory Manager for the Small Business/Self-Employed Division ("SB/SE Division"), and has been employed by the IRS for over 23 years. (# 12 at 1; # 58 at 3). In 1997, Plaintiff was employed as the chief of the IRS's Quality Measurement Branch in Indianapolis, Indiana. While employed in that capacity, Plaintiff, a white male, participated in the investigation of an EEO complaint filed by Barry Madison, a black female employee. (See Twisdale v. Snow, 325 F.3d 950, 951 (7th Cir. 2003)(# 14, Ex. 2). The employee subsequently filed a separate discrimination claim against Plaintiff. (Id.)

Plaintiff subsequently filed four EEO complaints of his own, alleging claims of retaliation and harassment by his black supervisors in Indiana, Mary Murphy and James Rogers, in response to his opposition of Ms. Madison's discrimination claim. (# 68 at 63). Then, on May 26, 2000, Plaintiff filed a lawsuit concerning those same retaliation claims in the United States District Court for the Southern District of Indiana. (# 14, Ex. 2; # 68 at 63). The District Court in Indiana granted summary judgment to the IRS in that case, and Plaintiff's subsequent appeal was unsuccessful. (# 14, Ex. 2).

During the year 2000, Plaintiff filed five agency grievances alleging retaliation on the basis of his prior EEO activity. (#

57, Ex. 1, Attach. A at 20).   The grievances were filed on the
following dates and raised the following claims:

- Grievance filed on 4-6-2000: My supervisor gave me
  a performance counseling memorandum.   The issues
  clearly had no business merit and were in
  retaliation for the fourth EEO complaint I had
  filed.

- Grievance filed on 4-16-2000: My supervisor gave me
  a memorandum containing negative and unwarranted
  feedback on my leadership skills.   Ms. Murphy had
  used an unorthodox and bias process to accomplish
  this action.   This was again in retaliation for the
  fourth EEO complaint I had filed.

- Grievance filed on 6-26-2000: This contains three
  issues.    My supervisor had lied on her EEO
  statement, violated IRS procedures in keeping and
  using recordation that should have been disposed of
  and violated the privacy act.

- Grievance filed on 8-1-2000: My acting supervisor falsely
  accused me of violating section 1204.

- Grievance filed on 10-22-2000:  My supervisor
  lowered my evaluation without justification or
  explanation.

(Id.)

     Around this time, the IRS underwent a reorganization.   On
October 1, 2000, Plaintiff began working as a Territory Manager for
Compliance Area 6 of the SB/SE Division, and was based in West
Virginia.   On October 22, 2000, Renee Mitchell was promoted to the
position of Compliance Area 6 Director for the SB/SE Division in
Detroit, Michigan, and became Plaintiff's immediate supervisor.  (#
59, Ex. A, ¶ 2; # 68 at 67).

7

Robert Finer, an attorney with IRS's General Legal Services Division, was assigned to handle Plaintiff's EEO complaints. On or about June 28, 2000, Mr. Finer requested copies of Plaintiff's grievances filed at that time. (# 12 at 6, ¶ 28; # 68 at 77, 79, 326). On or about August 18, 2000, Plaintiff's grievances were sent to Esra Ozben, an Employee Relations Specialist in the Office of Workforce Relations, after General Legal Services determined that only one of Plaintiff's grievances related to his EEO complaints, and that the others should be processed through the normal grievance procedures. (# 12 at 6, ¶ 29; # 68 at 77, 330).

However, according to an e-mail sent by Esra Ozben to Susan Anderson and Elaine Rogers on September 7, 2000, Plaintiff's grievances were essentially placed "on hold" while they attempted to determine if a global settlement of Plaintiff's Title VII case and the grievances was possible. (# 12 at 6, ¶¶ 28-33; # 68 at 68-69, 77, 78-80, 341).

During this time period, there was also some confusion as to who was the appropriate management official to review and issue a decision concerning Plaintiff's grievances. However, by December 1, 2000, Ms. Ozben determined that Renee Mitchell was the appropriate management official to handle the grievances. (# 12 at 6-7, ¶¶ 30, 34, 37; # 59 at 3; # 68 at 345-346).

Ms. Ozben sent the grievance files to Ms. Mitchell on December 5, 2000, with instructions to set up an appointment with Plaintiff

as soon as she received them.  (# 12 at 7; # 59 at 3 and Ex. B at 2; # 68 at 346).  Ms. Ozben further instructed Ms. Mitchell to "proceed with the grievance process as usual," and not to wait for an EEO settlement.  (# 12 at 7, ¶ 38; # 59 at 3; # 68 at 346).

On October 6, 2000, the Internal Revenue Manual ("IRM") 0771.1, Grievance Handbook was designated at the "Interim Guidance on Employee Grievance System." (# 59 at 3; # 68 at 134).  Section 118 of the Handbook, entitled "Avoidance of Delay," provides:

> Each grievance shall be given prompt consideration. Every effort shall be made to process the grievance in a timely manner.  Whenever possible the decision on the grievance should be made within 170 days from the date of the grievance.

(# 12 at 5, ¶ 26; # 68 at 114).

As provided in Section 133 of the Grievance Handbook, the grievance procedure is set up in five steps, each of which has specified time limitations.  Step 1 provides for the employee to address the grievance with his or her supervisor.  Step 2 provides for the employee to address the grievance with the "appropriate management official."  If the supervisor is also the appropriate management official, then Steps 1 and 2 are combined.  Step 3 provides for the employee to address the grievance with a "deciding official."  In Plaintiff's case, Ms. Mitchell was designated as the "Deciding Official" on Plaintiff's five grievances.[1]  (# 57-5, Ex.

_____

[1]  It appears that, due to Plaintiff's change of jobs, the reorganization of the IRS, and the fact that the "appropriate management officials" for his grievances would have been the

4, Answer to Interrogatory No. 3, Attach. A).

Section 133 of the Grievance Handbook specifically provides that, at Step 3, a determination of the merits of the grievance be made by the deciding official and a written decision be issued within 15 days.  (# 59 at 3; # 68 at 118).  If the grievance is not resolved by Step 3, then Step 4 provides for the designation of a "grievance examiner," who will submit a report of findings and recommendations to the deciding official.  (# 68 at 117-118).

Step 5 requires that, within 10 days of receiving the grievance examiner's report, the deciding official (1) accept the grievance examiner's report and issue a decision on the grievance, or (2) grant the relief sought by the employee and issue a decision accordingly, whether or not it is in accord with the grievance examiner's recommendations, or, that, within 20 days of receiving the grievance examiner's report, the deciding official prepare a specific statement of objections to the grievance examiner's recommendations and submit it to the next highest administrative level for a final decision.  (Id.)

The Grievance Handbook further provides:

> After 90 days have passed from the date the grievance was filed, and if the grievant has not yet been given an opportunity to request the designation of a grievance examiner due to delays in processing caused by management, the grievant may request such designation

---

managers that he had previously sued, the IRS skipped the first two steps of the grievance process concerning Plaintiff's grievances.

10

through the Director, Human Resources Division . . . .[2] (# 68 at 114).

On January 12, 2001, when nothing had been done about his grievances, Plaintiff contacted the Workforce Relations Office and requested that a grievance examiner be assigned to hear his grievances. (# 12 at 8, ¶ 39; # 59 at 4; # 68 at 350). Plaintiff also asked why there had been such a delay in the processing of his grievances. (Id.) He apparently received no explanation.

On February 6, 2001, Plaintiff made a second request for the assignment of a grievance examiner to Esra Ozben, and expressed his concern that no action had been taken to render a decision on his grievances. (# 12 at 8, ¶ 42; # 59 at 4; # 68 at 349). On February 7, 2001, Ms. Ozben responded and indicated that she had asked Ms. Mitchell to contact Plaintiff about scheduling a meeting as soon as possible. (# 68 at 349). That same day, Ms. Mitchell contacted Plaintiff to schedule an appointment to hear his grievances. (# 12 at 8, ¶ 43; # 68 at 62).

On February 14, 2001, Plaintiff met with Ms. Mitchell in Detroit to hear his grievances. (# 12 at 8, ¶ 44; # 68 at 62). Apparently, sometime in March of 2001, Ms. Mitchell advised Plaintiff by telephone that she did not believe she had the

---

[2] As part of the IRS reorganization, certain departments and titles were changed or eliminated,. (# 68 at 83). It appears that this title may have been changed to Director, Office of Workforce Relations.

11

authority to provide the relief that Plaintiff requested. (# 12 at 8, ¶ 45; # 68 at 62).

On March 23, 2001, Alter Sendler was assigned as a grievance examiner for Plaintiff's grievances. (# 12 at 8, ¶ 46; # 68 at 82). However, Plaintiff's Complaint alleges that Plaintiff was not informed of this assignment until September of 2001, despite his inquiries to the Workforce Relations Office and the Commissioner himself. (# 12 at 9-10, ¶¶ 47, 48, 51; # 68 at 62, 148).

No progress having been made with his grievances, Plaintiff sought EEO counseling on May 21, 2001 (# 12 at 9, ¶ 49; # 68 at 30), and on July 24, 2001, Plaintiff filed a formal EEO Complaint alleging retaliation through the failure to process his grievances. (# 12 at 9, ¶¶ 49, 50; # 68 at 17).

The Grievance Handbook provides that a decision from the grievance examiner should be received within 60 days. (# 68 at 118). However, Mr. Sendler could not begin his examination until a decision letter was received from Ms. Mitchell. A written decision on Plaintiff's grievances was not issued until August 23, 2001, 261 days after Ms. Mitchell was assigned to handle the grievances[3], and after Ms. Mitchell was told to make a response. (# 68 at 69). The response was ultimately executed by Daniel Nally,

---

[3] In his Amended Complaint, Plaintiff states that this delay was 251 days. The undersigned assumes that Plaintiff began counting from the date he believes Ms. Mitchell received his grievance files.

the acting Area Director, in Ms. Mitchell's absence. (# 68 at 70, 142). The response denied all of Plaintiff's requested remedies. (# 12 at 9, ¶ 52; # 68 at 140-142).

Once Mr. Sendler received the written decision, he asked Plaintiff to make a settlement offer on all five grievances, which Plaintiff did on September 18, 2001. (# 12 at 10, ¶ 57; # 68 at 156-157). Ms. Mitchell apparently did not receive a copy of the settlement statement. Thus, on October 9, 2001, Mr. Sendler faxed Ms. Mitchell a copy of the settlement offer and requested a response by October 17, 2001. However, Ms. Mitchell did not respond by that date, and no response to the settlement offer was ever received. (# 12 at 11, ¶¶ 59, 60; # 68 at 85).

On November 12, 2001, Mr. Sendler completed his examination of Plaintiff's grievances and submitted a written report to Ms. Mitchell. (# 12 at 11, ¶ 61; # 68 at 158-164). According to Plaintiff's Amended Complaint, Mr. Sendler granted Plaintiff most of the relief he sought. The Amended Complaint states:

> For example on Grievance 1, the memorandum of counseling was removed, on Grievance 2, the memorandums from Mr. Jones, Ms. Murphy, and Mr. Twisdale's rebuttal are all removed, on Grievance 3, Mr. Twisdale's EPF and other files maintained on him are to be brought into compliance with the Privacy Act and other record keeping requirements, on Grievance 4, Ms. Kirk's memorandum is removed from his file and on Grievance 5 the two sentences are removed from his evaluation. In addition, the Examiner makes two other recommendations that were not requested by the Plaintiff. He states Mr. Twisdale should be given a distinguished rating certificate and an explanation why management has delayed responding to his grievances.

13

(# 12, at 11, ¶ 62).

Mr. Sendler's report directed Ms. Mitchell to "Please process this report as described in IRM 0771.1, Section 133, Step 5 and/or Section 145(8)." (# 68 at 164). In accordance with Section 133, Step 5, Ms. Mitchell had 10 days to issue a decision accepting the report, or 20 days to submit a written objection to the next highest level. (# 68 at 118-119). Under Section 145(8), which governs grievances related to the "Performance Management and Recognition System" ("PMRS")[4], Ms. Mitchell was to prepare a final and binding decision concerning Plaintiff's performance rating within 10 days of receipt of the grievance examiner's report. (# 68 at 121). Ms. Mitchell did none of these things in a timely manner.

Despite several reminders by Plaintiff, Ms. Mitchell had still not issued a response to the grievance examiner's report by August 12, 2002. (# 12 at 11-12, ¶¶ 63-65; # 68 at 363). Thus, on August 13, 2002, Plaintiff sent an e-mail message to Tom Hull, the Deputy Director of the SB/SE Compliance Field Operations, and Ms. Mitchell's immediate supervisor, requesting his assistance to require Ms. Mitchell to respond to the report. (# 12 at 12, ¶ 66).

---

[4] As discussed in the Grievance Handbook, grievances concerning performance ratings are processed differently than other types of grievances. (# 68 at 120-121). Under this provision, Ms. Mitchell was designated as the "Reconsideration Official" on Plaintiff's fifth grievance, which concerned his performance rating.

Mr. Hull's response to Plaintiff stated: "I talked to Renee today and she assured me that you will be receiving a response soon. I made it clear that it was important that the response be sent to you prior to her leaving her current position." (# 12 at 12, ¶ 67; # 59 at 8, 25).

On September 23, 2002, 315 days after the submission of the grievance examiner's report, Ms. Mitchell issued a decision to the Plaintiff accepting the report. (# 12 at 12, ¶ 68). At that time, a total of 657 days had passed since Plaintiff's grievances had been sent to Ms. Mitchell.[5]

## ANALYSIS

### A.   **Prima facie** case of retaliation.

### Plaintiff engaged in protected activity under Title VII

To establish a prima facie case of retaliation, Plaintiff must establish that he engaged in protected activity. There is no question in the matter at bar that Plaintiff had participated in protected EEO activity and that Defendant was aware of that activity. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Plaintiff has satisfied this first prong

---

[5]  According to Plaintiff, Ms. Mitchell thereafter refused to implement some of the decisions of the grievance examiner, despite having agreed to the report. Plaintiff asserts that, rather than accept the report, Ms. Mitchell should have issued a statement of objections and offered Plaintiff his appeal rights. Plaintiff states that this was another action to prevent him his employee rights. (# 59 at 8-9). However, this issue was found to be unexhausted in the EEO proceedings, so the undersigned will not address it herein.

15

of the <u>prima</u> <u>facie</u> case.

<u>Plaintiff suffered a materially adverse action</u>

a.   Applicability of <u>Burlington Northern</u> decision

Plaintiff must also establish that Defendant took a materially adverse action against Plaintiff.   However, the primary issue now before the court is whether the adverse action must be a "personnel" or "employment-related" action.

The United States government enjoys sovereign immunity from suit unless Congress, in enacting legislation, has waived that immunity.   The United States Supreme Court has repeatedly held that a waiver of sovereign immunity "'cannot be implied but must be unequivocally expressed.'"   <u>Irwin v. Dep't of Veterans Affairs</u>, 498 U.S. 89, 95 (1990)(quoting <u>United States v. Mitchell</u>, 445 U.S. 535 (1980)); <u>see</u> <u>also</u> <u>United States v. Nordic Village, Inc.</u>, 503 U.S. 30. 33-34 (1992).   In <u>Nordic Village</u>, the Court further stated that:

> "the Government's consent to be sued 'must be construed strictly in favor of the sovereign,' <u>McMahon v. United States</u>, 342 U.S. 25, 27, [72 S. Ct. 17, 19, 96 L. Ed. 26] (1951), and not 'enlarge[d] . . . beyond what the language requires.'" <u>Ruckelshaus v. Sierra Club</u>, 463 U.S. 680, 685, 103 S. Ct. 3274, 3278, 77 L. Ed.2d 938 (1983) (quoting <u>Eastern Transportation Co. v. United States</u>, 272 U.S. 675, 686, 47 S. Ct. 289, 291, 71 L. Ed.2d 472 (1927)), a rule of construction that we have had occasion to reaffirm once already this Term, see <u>Ardestani v. INS</u>, 502 U.S. 129, 137, 112 S. Ct. 515, 520-521, 116 L. Ed.2d 496 (1991).

503 U.S. at 34.

16

As stated previously herein, the presiding District Judge denied the Defendant's Motion to Dismiss, relying upon the Supreme Court's decision in <u>Burlington Northern</u>, *supra*, 126 S. Ct. 2405 2414 (2006) to find that Plaintiff need not show that the materially adverse action taken by the Defendant was "employment-related." <u>Burlington Northern</u> was a case involving a private sector employer, and interpreted the anti-retaliation provision found in 42 U.S.C. § 2000-3(a). Defendant's Motion for Summary Judgment argues that the <u>Burlington Northern</u> decision is inapplicable in the context of federal government employment, because the federal government has not waived sovereign immunity beyond the limited waiver for "personnel actions" contained in Section 2000e-16(a) of Title VII. (# 58 at 3). The undersigned does not believe the waiver of sovereign immunity concerning retaliation lawsuits by federal employees can be drawn so narrowly. A brief discussion of the authority involved and the progression of the precedent concerning it is in order.

Section 2000e-2(a) governs "Unlawful employment practices." It states:

> It shall be an unlawful employment practice for an employer -
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his <u>compensation, terms, conditions, or privileges of employment</u>, because of such individual's race, color, religion, sex, or national origin; or

17

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(emphasis added).  Section 2000e-3 governs "Other unlawful employment practices," such as retaliation, which is discussed in subsection (a).  It states:

> **(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings.**
>
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  These provisions were initially enacted as part of the Civil Rights Act of 1964.

In 1972, Congress enacted a new section of the Civil Rights Act, 42 U.S.C. § 2000e-16, governing "Employment by Federal Government."  The present version of subsection (a) of that section provides as follows:

> **(a) Discriminatory practices prohibited; employees or applicants for employment subject to coverage.**
>
> All personnel actions affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of Title 5, in executive agencies as defined in section 105 of Title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Rate Commission, in those units of the Government of the District of Columbia

18

having positions in the competitive service, and in those
units of the judicial branch of the Federal Government
having positions in the competitive service, in the
Smithsonian Institution, and in the Government Printing
Office, the General Accounting Office, and the Library of
Congress <u>shall be made free from any discrimination</u> based
on race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-16(a)(emphasis added).  As an employee of the

IRS, an executive agency of the United States government, Plaintiff

is a covered employee under this section.

It is apparent from the statutory text that section 2000e-
16(a) does not contain any specific language about "retaliation" or
"discrimination" on the basis of participation in enforcement
proceedings, as does section 2000e-3(a).  Yet, as discussed by
Defendant in his Memorandum of Law in support of his Motion for
Summary Judgment:

> Although § 2000e-16(a) does not expressly authorize
> retaliation claims against the Government, such claims
> are cognizable because § 2000e-16(d) incorporates §§
> 2000e-5(f) through (k)[footnote omitted].  One of the
> incorporated subsections, § 2000e-5(g), authorizes courts
> to order remedies for retaliation [FN 7].

> [FN 7 - Section 2000e-5(g)(2)(A) provides: No order of
> the court shall require the admission or reinstatement of
> an individual as a member of a union, or the hiring,
> reinstatement, or promotion of an individual as an
> employee, or the payment to him of any backpay, if such
> individual was refused admission, suspended, or expelled,
> or was refused employment or advancement or was suspended
> or discharged for any reason other than discrimination on
> account of race, color, religio[n], sex, or national
> origin <u>or in violation of section 704(a)[42 U.S.C. §
> 2000e-3(a)</u>]    42 U.S.C. § 2000e-5(g)(2)(A)(emphasis
> added).

(# 58 at 8 n.7).

Thus, retaliation claims are cognizable under § 2000e-16(a) because of its incorporation of § 2000e-5(g). Although § 2000e-5(g)(2)(A) refers to remedies for violations of § 2000e-3(a), Defendant attempts to distinguish retaliation claims under § 2000e-16(a) from those under § 2000e-3(a) based upon the statutory text. In footnote 7 of his Memorandum of Law, Defendant continues:

> Notably, § 2000e-5(g)(2)(A) only authorizes courts to order the specified remedies in cases where an employee or applicant is "refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged" - all traditional adverse personnel actions.

(# 58 at 8 n.7). Defendant's Memorandum of Law further states:

> There is, however, an important limitation on the incorporation of §§ 2000e-5(f) through (k): Section 2000e-16(d) specifies that these subsections govern "as applicable," in "civil actions brought hereunder" - that is, in civil actions brought under § 2000e-16. By the express terms of § 2000e-16(a), civil actions under § 2000e-16 are limited to claims involving "personnel actions." 42 U.S.C. § 2000e-16(a). Moreover, given that waivers of sovereign immunity must be "unequivocally expressed," the mere incorporation of *remedies* for violations of 2000e-3(a) would be insufficient to expand the Government's sole waiver of sovereign immunity beyond the clear limits set by 2000e-16(a). Nordic Village, 503 U.S. at 33. Accordingly, both discrimination and retaliation claims by federal employees are confined to suits involving adverse personnel actions.

(# 58 at 7-8).

In the Fourth Circuit, the law concerning what type of conduct is actionable under these statutes has steadily evolved. In 1981, the Court decided Page v. Bolger, 645 F.2d 227 (4th Cir. 1981), a case involving a federal postal employee. In Page, the court held:

20

> The proper object of inquiry in a claim of disparate treatment under § 717 [§ 2000e-16] is whether there has been "discrimination" in respect to "personnel actions affecting (covered) employees or applicants for employment ...." 42 U.S.C. § 2000e-16(a)(emphasis added). Disparate treatment theory as it has emerged in application of this and comparable provisions of Title VII, most notably § 703(a)(1), 42 U.S.C. § 2000e-2(a)(1), has consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating. This is the general level of decision we think contemplated by the term "personnel actions" in § 717.

> \* \* \*

> By this, we suggest no general test for defining those "ultimate employment decisions" which alone should be held directly covered by § 717 and comparable antidiscrimination provisions of Title VII.

Id. at 233.

In 2001, the Fourth Circuit decided Von Gunten v. Maryland, 243 F.3d 858 (4th Cir. 2001), addressing the standard to be applied in retaliation cases under section 2000e-3(a). In Von Gunten, the court stated:

> But "ultimate employment decision" is not the standard in this circuit . . . . we have expressly rejected distinctions, like those drawn by the Mattern [v. Eastman Kodak Co., 104 F.3d 702 (5th Cir. 1997)] court, between § 2000e-2 and 2000e-3, reasoning that "conformity between the provisions of Title VII is to be preferred." Ross v. Communications Satellite Corp., 759 F.2d 355, 366 (4th Cir. 1985).

243 F.3d at 865. The court ultimately held that "conduct short of 'ultimate employment decisions' can constitute adverse employment action for purposes of § 2000e-3(a)," but restricted actionable conduct to discriminatory acts or harassment that "adversely

affected 'the terms, conditions, or benefits' of the plaintiff's
employment." Id. (emphasis added)(citing Munday v. Waste Mgmt. of
North America, Inc., 126 F.3d 239, 243 (4th Cir. 1997).

In Von Gunten, the Court specifically distinguished section
2000e-16 from section 2000e-3.  The Court stated:

> Significantly, in Page, the employee sued not under §
> 2000e-3, which proscribes retaliation in the private
> sector, but under § 2000e-16, an anti-discrimination
> provision that applies only to federal sector employees.
> See id. at 228.  Section 2000e-16 provides in relevant
> part that "all personnel actions" shall be free from any
> discrimination.  42 U.S.C. § 2000e-16 (1994).   We
> reasoned in Page that inclusion of the term "personnel
> action" in § 2000e-16 indicated that "ultimate employment
> decisions" arose to the "general level of decision"
> targeted by Congress in that statute.  Id. at 233.  See
> also Boone v. Goldin, 178 F.3d 253, 255-56 (4th Cir.
> 1999)(citing Page in another federal sector case).  Of
> course, § 2000e-3 does not confine its reach to
> "personnel actions" and thus this reasoning simply does
> not apply to retaliation actions, like the one at hand.

243 F.3d at 866 n.3.  Based upon Page and Von Gunten, Defendant's
argument that discrimination or retaliation claims under section
2000e-16 are limited to those that affect "personnel actions"
appears to have merit.

In Baqir v. Principi, 434 F.3d 733 (4th Cir. 2006), however,
the Fourth Circuit addressed a retaliation claim brought by a
black, Muslim, Pakastani doctor employed by the Department of
Veterans Affairs, who had sought EEO counseling and filed an
administrative complaint.  The plaintiff therein had identified
acts of alleged retaliation by federal government officials that
included impoundment of household goods, reporting the denial of

his request for privileges in a national databank, and demanding the return of "special pay." Id. at 747.

The court upheld a grant of summary judgment to the government defendant on the basis that the plaintiff had not demonstrated that the defendant was aware of his prior EEO activity.  However, the court implied that conduct, such as that alleged by the plaintiff to be retaliatory, which did not directly relate to the plaintiff's terms, conditions, or benefits of employment, could be considered "adverse actions" sufficient to sustain a retaliation claim.  Id. at 748.  In making that statement, the court left out the word "employment," as it had been used in Von Gunten (requiring an "adverse employment action" to make a prima facie case of retaliation under § 2000e-3(a)).  The undersigned believes this omission to be significant.

On June 22, 2006, the United States Supreme Court decided Burlington Northern, supra, which, as previously stated, was a private sector case.  There, the Court recognized that "[t]he language of the substantive provision [§ 2000e-2] differs from that of the anti-retaliation provision [§ 2000e-3(a)] in important ways" and that "the question is whether Congress intended its different words to make a legal difference."  The Court further stated:

> There is strong reason to believe that Congress intended
> the differences that its language suggests, for the two
> provisions differ not only in language but in purpose as
> well.   The  anti-discrimination  provision  seeks  a
> workplace where individuals are not discriminated against
> because  of  their  racial,  ethnic,  religious  or  gender-

23

based status.  See <u>McDonnell Douglas Corp. v. Green</u>, 411
U.S. 792, 800-801, 93 S. Ct. 1817, 36 L. Ed.2d 668
(1973).  The anti-retaliation provision seeks to secure
that primary objective by preventing an employer from
interfering (through retaliation) with an employee's
efforts to secure or advance enforcement of the Act's
basic guarantees.  The substantive provision seeks to
prevent injury to individuals based on who they are,
*i.e.*, their status. The anti-retaliation provision seeks
to prevent harm to individuals based on what they do,
*i.e.*, their conduct.

To secure the first objective, Congress did not need
to prohibit anything other than employment-related
discrimination.  The substantive provision's basic
objective of "equality of employment opportunities" and
the elimination of practices that tend to bring about
"stratified job environments," <u>id.</u>, at 800, 93 S. Ct.
1817, would be achieved were all employment-related
discrimination miraculously eliminated.

But one cannot secure the second objective by
focusing only upon employer actions and harms that
concern employment and the workplace.  Were all such
actions and harms eliminated, the anti-retaliation
provision's objective would <u>not</u> be achieved.  An employer
can effectively retaliate against an employee by taking
actions not directly related to his employment or by
causing him harm <u>outside</u> the workplace.  See, *e.g.*,
<u>Rochon v. Gonzales</u>, 438 F.3d [1211], at 1213 [(D.C. Cir.
2006)] (FBI retaliation against employee "took the form
of the FBI's refusal, contrary to policy to investigate
death threats a federal prisoner made against [the agent]
and his wife"); <u>Berry v. Stevinson Chevrolet</u>, 74 F.3d
980, 984, 986 (C.A. 10 1996)(finding actionable
retaliation where employer filed false criminal charges
against former employee who complained about
discrimination).  A provision limited to employment-
related actions would not deter the many forms that
effective retaliation can take.  Hence, such a limited
construction would fail to fully achieve the anti-
retaliation provision's "primary purpose," namely,
"[m]aintaining unfettered access to statutory remedial
mechanisms." <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337,
346, 117 S. Ct. 843, 136 L. Ed.2d 808 (1997).

126 S. Ct. at 2412.  Thus, the Supreme Court has distinguished the

24

standard for discrimination claims from that for retaliation claims based upon their purpose. Plaintiff recognizes this important policy distinction in his briefs.

Plaintiff's Response asserts that public sector employees are entitled to the same protections as private sector employees. Plaintiff states:

> The High Court did not directly address the question of whether the conduct it found offensive in Burlington Northern, and covered by 42 U.S.C. § 2000e-3(a), was to be applied to federal sector employees covered by 42 U.S.C. § 2000e-16. The Plaintiff submits that there is no reason why a federal employee should be covered by a different standard in light of the relevant precedent of the High Court in Loeffler v. Frank, 486 U.S. 549, 559 (1988), citing Chandler v. Roudebush, 425 U.S. 840, 841 (1976), quoting S. Rep. No. 92-415, p.16 (1971). There, the High Court opined that "Congress intended to provide federal employees with 'the rights available in the courts as are granted to individuals in the private sector under Title VII.'" The protection against retaliation for private sector employees, that the High Court recognized in Burlington Northern, should not be construed to exclude public sector employees. Moreover, the High Court relied upon the D.C. Circuit's decision in Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006), a case involving a federal sector retaliation claim, to fashion its decision in Burlington Northern. The Rochon court held that a retaliation claim was to be measured by a different standard than that applied in workplace discrimination cases. The Rochon court further held, and the High Court agreed, that any conduct which might dissuade "a reasonable worker from making or supporting a charge of discrimination," met the test for retaliation for federal workers under Title VII.

(# 59 at 10-11).

In Rochon, an African American special agent of the Federal Bureau of Investigation ("FBI") alleged that the FBI's failure to investigate threats made against the agent and his family by a

federal prisoner was discriminatory and done in retaliation for the agent's prior EEO activity. The failure to investigate these threats was clearly unrelated to any term, condition or benefit of the agent's employment and, thus, did not concern a "personnel action." In summarizing the issue before the court, the Circuit Court stated:

> Here we must determine whether the Government is similarly liable under § 2000e-3(a) for retaliation that does not come in the form of a personnel action. In other words, we must consider whether, when referenced in § 2000e-16(d) via § 2000e-5(g)(1)-(2)(A), the general ban on retaliation in § 2000e-3(a) is limited by the requirement in § 2000e-16(a) that "[a]ll [Government] personnel actions" be made free from discrimination. We do not believe the prohibition is so qualified. Nothing in § 2000e-16(d) or § 2000e-5(g) suggests § 2000e-3(a) is to be read differently when applied to the Government. Nor did the Supreme Court in any way qualify its observation in Morton v. Mancari, 417 U.S. 535, 547. 94 S. Ct. 2474. 41 L.Ed.2d 290 (1974), that "the substantive anti-discrimination law embraced in Title VII was carried over and applied to the Federal Government" through the addition of § 2000e-16 in 1972. See also Dothard v. Rawlinson, 433 U.S. 321, 331 n.14, 97 S. Ct. 2720, 53 L. Ed.2d 786 (1977)(noting "Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike" (citing H.R. Rep. No. 92-238, at 17 (1971); S. Rep. No. 92-415, at 10 (1971))). In light of the Congress's recognized intent in 1972 to apply to the Government the principles it had in 1964 applied to private employers, we now hold that an alleged act of retaliation by the Government need not be related to the plaintiff's employment in order to state a claim of discrimination under Title VII.

438 F.3d at 1219.

The court in Rochon further explained that this rationale is consistent with the Equal Employment Opportunity Commission's ("EEOC") interpretation of Title VII. As noted by the court, the

26

EEOC's Compliance Manual states: "The statutory retaliation clauses
[including that of Title VII] prohibits any adverse treatment that
is based on a retaliatory motive and is reasonably likely to deter
the charging party or others from engaging in protected activity."
EEOC Compliance Manual, Section 8-II.D.3 (1998).  438 F.3d at 1218.
The Rochon court then cited Robinson v. Shell Oil Co., 519 U.S.
337, 346 (1997), in which the Supreme Court stated:

> It would be destructive of this purpose of the anti-
> retaliation provision [that is, to maintain unfettered
> access to statutory remedial mechanisms] for an employer
> to be able to retaliate with impunity against an entire
> class of acts under Title VII - for example, complaints
> regarding discriminatory termination.

The Rochon court also noted that limiting the interpretation of §
2000e-16(a) to only recognize retaliation claims concerning
"personnel actions" would allow a federal government employer to
retaliate against an employee "with impunity" "as long as the
employer takes an action unrelated to the plaintiff's employment."
438 F.3d at 1218.

In his Reply, Defendant notes that the United States Court of
Appeals for the Fourth Circuit has not directly addressed this
issue, but cites to a decision out of the Eastern District of
Virginia, in which the court, relying strictly on the statutory
language, held that the Burlington Northern decision was
inapplicable in federal sector employment.  See Ridgely v. Chao,
Civil Action No. 1:06-343 (E. D. Va., Dec. 19, 2006).  (# 64 at 3
and Ex. A).  In both of his briefs, Defendant also seeks to limit

27

the Supreme Court's citation of <u>Rochon</u> in <u>Burlington Northern</u> to defining the "materially adverse" standard.  Defendant's initial Memorandum of Law in support of his Motion for Summary Judgment states in pertinent part:

> <u>Burlington Northern</u> did nothing more than borrow the language of the D.C. Circuit's standard.  The Court did not purport to interpret § 2000e-16, nor did it express an opinion as to whether <u>Rochon</u>'s discussion of retaliation claims against the Government was correct. Indeed, any discussion of § 2000e-16 would have been dicta, as <u>Burlington Northern</u> was a private sector case and thus did not implicate § 2000e-16.

(# 58 at 9-10 n.8).

The undersigned agrees with the court in <u>Rochon</u> that a limitation of retaliation claims under § 2000e-16(a) to those claims involving "personnel actions" would be contrary to public policy, and would contravene the intent of Congress when it enacted that section.  The undersigned also finds it significant that, in <u>Burlington Northern</u>, the Supreme Court cited to <u>Rochon</u> and made no distinction between it and the private sector retaliation cases to which the Court also referred.  Likewise, in <u>Baqir</u>, the Fourth Circuit did not distinguish between retaliation claims brought under § 2000e-16 and § 2000e-3.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the Supreme Court's ruling in <u>Burlington Northern</u> is applicable in the context of federal sector employment. Thus, the undersigned further proposes that the presiding District Judge **FIND** that in order to state a <u>prima facie</u> claim of

28

retaliation under Title VII, Plaintiff need not show that the alleged retaliatory conduct by the Defendant involved or affected a "personnel action."

As noted by the presiding District Judge in his prior Memorandum Opinion and Order, "[a]n employer's purposeful allowance of the languishing, over an unusually extended period of time, of an employee's grievance may likely be an exploitation of the exhaustion requirement that effectively renders the employee's administrative remedy unavailable, thereby producing significant injury or harm." (# 34 at 9). Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the delay in processing Plaintiff's grievances constitutes a materially adverse action cognizable under § 2000e-16(a), and that the United States has waived its sovereign immunity on such claims.

> b.   Delay in grievance process is an adverse
>      employment action

In the alternative, if the presiding District Judge should find that <u>Burlington Northern</u> is not applicable in the federal sector, then, as argued by Defendant, Plaintiff is required to show that Defendant took an "adverse employment action," which is one that "adversely affected a term, condition or benefit of employment." <u>Von Gunten</u>, *supra,* 243 F.3d at 285.

Defendant asserts that an "adverse employment action" requires "at a minimum, serious employment consequences and must be material." (# 58 at 10). Defendant cites the Fourth Circuit's

29

decision in <u>Boone v. Goldin</u>, 178 F.3d 253, 255 (4th Cir. 1999), in which the court emphasized "that Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment." Defendant further asserts that "Congress stressed that a Title VII claim is valid only if a plaintiff can show that his employer's action had a significant detrimental effect on him." (<u>Id.</u> at 10-11).

Defendant argues that Plaintiff "has failed to offer evidence that this delay [in the processing of the grievances] caused an adverse effect in the terms, conditions or benefits of his employment." (<u>Id.</u>)  Defendant further states:

> While Plaintiff certainly would have preferred that his grievances be handled promptly, he has failed to demonstrate that the delay caused a significant detrimental effect on him.  Defendant's failure to process the grievances in accordance with agency time lines cannot be construed as anything more than a "trivial discomfort[] endemic to employment."

(<u>Id.</u>)

In his Response, Plaintiff asserts that "[t]he IRS agency grievance system "applies to any matter of concern or dissatisfaction relating to the employment of an employee(s) which is subject to the control of agency management."  (# 59 at 20)(citing IRM Grievance Handbook, # 68 at 112, ¶ 117(1)). Plaintiff further asserts that the grievance process is "a benefit of employment that allows employees to redress perceived wrong doing."  (<u>Id.</u>)

Plaintiff further asserts that, in delaying the resolution of Plaintiff's grievances, Defendant deliberately violated its own policies and procedures.  Plaintiff asserts that in its Retaliation Manual, the EEOC has stated that suspending or limiting access to an internal grievance procedure constitutes an "adverse action." See Section 8-II.D.1, "EEOC Compliance Manual," available at http://www.eeoc.gov/.

In his Reply, Defendant asserts that Plaintiff has not demonstrated "how the term, condition or benefit of employment was altered or how he was negatively impacted by the alteration."  In a footnote thereafter, Defendant further states:

> Notwithstanding Plaintiff's argument that the grievance process is a "benefit" of employment, he fails to make the requisite showing of harm.  Defendant has conceded the mishandling of Plaintiff's consolidated grievances but has maintained that the delay caused no significant harm to Plaintiff.  Plaintiff "lost" nothing as a result of the delay.  Plaintiff has offered no evidence of a missed opportunity (although he vaguely alleged some). It is clear that Plaintiff is angry and frustrated over the mishandling of his grievances.  It is equally clear that Plaintiff's inability to move the process along with repeated phone calls and letters added fuel to his frustration and feelings of helplessness.  Nevertheless, Plaintiff has not demonstrated that he suffered any adverse consequences vis a vis the delay in processing and therefore cannot make a prima facie case.

(# 64 at 4 n.4).

Defendant contends that the court must examine what effect the delay in processing the grievances had on Plaintiff's employment. Specifically, Defendant states:

31

> For instance, in the first grievance, Plaintiff grieved the inclusion of a negative document in his personnel file.  However, during that same fiscal year, Plaintiff received a rating of "Distinguished" and was selected for a new managerial position.  Plaintiff had not been harmed [by] the document remaining in his file during the extended processing period.  In fact, Plaintiff has not identified any positions for which he applied and was not selected.  Defendant concedes the situation may be different were Plaintiff able to demonstrate he applied for a job and was rejected based upon the documents/negative comments contained in his personnel file about which he filed grievances and which were later expunged from his file.  But there is no evidence here that Plaintiff applied for a promotion and was not selected because of negative references contained in his personnel file.  Plaintiff's conclusory allegation that "[f]or the balance of [his] career he will never again be taken seriously for advancement opportunities" is wholly without factual or evidentiary support.  <u>See</u> Response at 19.

(# 64 at 5).

The undersigned agrees with Plaintiff that the right to "use the agency grievance process in an unrestricted manner" is itself a benefit of employment, and that Plaintiff's right to that benefit was adversely affected by Defendant's conduct.  The benefit of a grievance system is not limited to a given result in a particular case.  A well-functioning grievance system efficiently and economically processes and resolves employment disputes, giving employees a neutral forum to voice their complaints.  When the grievance system bogs down in inaction, the benefit is lost.  There is no significant difference between a supervisor telling a qualified employee that he is not permitted to use the grievance system, and the supervisor failing to process that employee's

grievances.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the process for allowing federal government employees to file grievances concerning issues related to their employment is a "benefit" of employment, as that term is used in the Fourth Circuit's decision in <u>Von Gunten</u>, and that the delay in processing Plaintiff's grievances, as alleged in his Complaint, adversely and materially affected that benefit of employment.

Therefore, the undersigned further proposes that the presiding District Judge **FIND** that Plaintiff has satisfied the second prong of the <u>prima facie</u> case for a claim of retaliation under Title VII.

> <u>There is a nexus between Plaintiff's protected conduct and Defendant's adverse action.</u>

The third prong of a <u>prima facie</u> case of retaliation under Title VII, requires that Plaintiff demonstrate that there is a causal connection between the protected activity and the asserted adverse action. <u>Von Gunten</u>, 243 F.3d at 863. As stated in the previous Proposed Findings and Recommendation concerning Defendant's Motion to Dismiss, Plaintiff need only show that the protected activity and the adverse action are not completely unrelated, <u>see</u>, <i>e.g.</i>, <u>Daniel v. Church's Chicken</u> 942 F. Supp. 533 (S.D. Ala. 1996), and the causal connection can be indirectly shown by proximity in time. <u>Tinsley v. First Union Nat'l Bank</u>, 155 F.3d 435, 443 (4th Cir. 1998).

Ms. Mitchell was clearly aware of Plaintiff's prior EEO activity by December of 2000, when she was assigned the duty of resolving his agency grievances, which concerned alleged retaliation for prior EEO activity. Therefore, the undersigned proposes that the presiding District Judge **FIND** that Plaintiff has satisfied the <u>de minimus</u> requirement of showing a causal connection between his EEO activity and Defendant's delay in resolving Plaintiff's grievances.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Plaintiff has made a <u>prima facie</u> case of retaliation under Title VII.

**B.    Defendant's Legitimate Non-retaliatory Reasons for Delay.**

Having found that Plaintiff has made a <u>prima facie</u> case of retaliation under Title VII, the burden shifts to Defendant to provide a legitimate non-retaliatory or non-discriminatory reason for Ms. Mitchell's conduct. However, this is merely a burden of production, not proof. Defendant's Memorandum of Law in support of his Motion for Summary Judgment offers the following summary of reasons:

> Ms. Mitchell explained the delay in processing Plaintiff's grievances was occasioned by a number of factors. Specifically, Ms. Mitchell stated that: 1) she had been newly promoted just before being assigned Plaintiff's grievances; 2) she misunderstood that she would be receiving processing assistance from the labor relations staff; 3) she understood the grievances were to be part of a global settlement entered into by the agency and Plaintiff to resolve these and other claims; and 4)

> her executive training, as well as her other work
> obligations as a new executive, demanded her immediate
> attention.   Based upon these and other factors, Ms.
> Mitchell simply failed to process the grievances in a
> timely fashion. [citation omitted].

(# 58 at 12).

## C.   Plaintiff Must Demonstrate Pretext.

As Defendant has proffered at least one non-retaliatory reason

for Ms. Mitchell's delay in processing Plaintiff's grievances,

Plaintiff must prove that the reasons offered are a pretext for

retaliation.   In his Response brief, Plaintiff discusses the

standard established by the Supreme Court to support a finding of

discrimination.   Plaintiff's brief states:

> The High Court has found that evidence sufficient to
> discredit an employer's proffered nondiscriminatory
> reasons for its actions, taken together with the
> complainant's prima facie case, may be sufficient to
> support a finding of discrimination.
>
> > [A] plaintiff's prima facie case, combined
> > with sufficient evidence to find that the
> > employer's asserted justification is false,
> > may permit the trier of fact to conclude that
> > the employer unlawfully discriminated.
>
> Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct.
> 2097 (2000).
>
> As a result of the Reeves opinion the Fourth Circuit has
> dramatically modified its reliance on the pretext or
> animus plus model of analysis.   According to the Fourth
> Circuit, "the Supreme Court invalidated the requirement
> that 'a plaintiff must always introduce additional,
> independent evidence of discrimination' to survive
> summary judgment." Rowe v. Marley Co., 233 F.3d 825, 830
> (4th Cir. 2000)(quoting Reeves, 530 U.S. at 149).   Based
> upon this interpretation of Reeves, the Fourth Circuit
> should now work with the framework under which, absent
> evidence that "no rational fact finder would conclude

35

that the action was discriminatory," a court in the
Fourth Circuit may not require a plaintiff who proves
both a prima facie case and pretext to produce additional
proof of discrimination in order to survive a defendant's
motion for summary judgment." Id.

(# 59 at 31). Plaintiff then addresses each of the proffered

reasons that Defendant has offered for why Ms. Mitchell took so

long in handling Plaintiff's grievances, and argues that those

reasons are pretextual.

Specifically, Plaintiff asserts that the fact that Ms.

Mitchell had been newly promoted just before being assigned

Plaintiff's grievances does not offer a valid reason for the

substantial delay in the grievance process. Plaintiff states,

"Employees are promoted into new positions all the time with the

expectation of carrying out their responsibilities. The Plaintiff

fails to understand why such a promotion would excuse Ms. Mitchell

from executing her duties fairly and timely according to IRS

Internal Revenue Manual procedures." (# 59 at 32).

Defendant's next proffered reason was that Ms. Mitchell

misunderstood that she would be receiving assistance from labor

relations staff. Plaintiff asserts that Ms. Mitchell knew what her

responsibilities were and that she was in contact with labor

relations staff concerning this matter. Plaintiff further asserts

that Ms. Mitchell had been in IRS management for many years and

that she "has worked all types of personnel matters in her career.

To assume that she didn't know what to do or what to expect is

36

simply not credible." (Id. at 33).

Defendant also asserted that Ms. Mitchell's executive training and other new work obligations demanded her immediate attention. However, Plaintiff contends that the executive training did not begin until late March 2001, and that Ms. Mitchell had the grievances at the beginning of December 2000. (Id. at 36-37).

Defendant further asserted that Ms. Mitchell understood that the grievances were to be a part of a global settlement of Plaintiff's EEO complaint and other claims. While Plaintiff does not dispute the validity of this reason, he cites it as evidence in support of his belief that Defendant's conduct was chilling to the exercise of his Title VII rights, stating:

> A strategy such as this would clearly discourage employees from exercising their rights under Title VII if they believe management is capable of violating its own procedures to exert pressure and distress on employees who file EEO complaints. Simply put, if the Plaintiff had never filed the EEO complaints and subsequent lawsuit there never would have been a delay in the processing of the grievances. The Defendant can not point to any IRS procedure or standing practice that would permit such a delay. The grievances were being held hostage as a means to exert pressure and distress on the Plaintiff in order to force a more favorable EEO settlement for the IRS.

(Id. at 34-35).

Although not directly addressed in his Motion for Summary Judgment, Defendant has offered other reasons for the delay in processing Plaintiff's grievances, which Plaintiff discusses in his Response. Those include Defendant's explanation that (1) the reorganization of the IRS contributed to the confusion as to who

37

was responsible for handling Plaintiff's grievances and Ms. Mitchell's authority to resolve the grievances, and (2) Ms. Mitchell's belief that the grievances were not of an "urgent nature."

As to the first reason, Plaintiff asserts that, by December of 2000, the confusion was cleared up when Esra Ozben assigned Ms. Mitchell the responsibility for resolving the grievances. (Id. at 39-40). Concerning Ms. Mitchell's belief that the grievances were not of an "urgent nature," Plaintiff asserts that grievances, no matter what their subject, should be treated equally, and there is no provision in the grievance process for a distinction on what issues are "urgent." Plaintiff also asserts that Ms. Mitchell further delayed the resolution of Plaintiff's grievances, even after she had been ordered to take action on them, and that there is no justification for the substantial delay that occurred in this matter. (Id. at 40).

On March 27, 2007, Ms. Mitchell executed a sworn Declaration in response to some of Plaintiff's discovery requests concerning what prevented her from responding to the grievances and the subsequent grievance examiner's report. In that Declaration, Ms. Mitchell asserted that she did not have possession of Plaintiff's Employee Personnel File ("EPF") and could not make a response to the grievance examiner's report until she had the file. (# 59, Ex. A at 4, ¶ 17).

38

Plaintiff further notes that, in the March 27, 2007 Declaration, after Ms. Mitchell had addressed the other non-discriminatory reasons stated in Defendant's motion, she provided an additional response stating that "my travel and appointments and other obligations did not specifically prevent me from issuing the decision. If I had perceived that the delay was causing any harm to the Plaintiff in any way, I would have issued the decision immediately regardless of my schedule and without waiting for the EPF to be located. (Id. at 5, ¶ 18). Plaintiff's Reply states:

> This new admission is in complete opposition to and negates all the known excuses the Defendant has proffered to date. Clearly, Ms. Mitchell did not have any barriers preventing her from making a timely response. Ms. Mitchell made a similar admission on her December 3, 2001 Unsworn Declaration where she "accept(ed) full responsibility for not providing a response to the grievances before (she) left for XD training." See Exhibit D, Page 3. She also stated that it was "(her) oversight that no formal grievance response was prepared." See Exhibit D, Page 2.

(# 59 at 37).

Although Plaintiff is not required to show independent evidence of a retaliatory motive, Plaintiff also offers evidence supporting a finding that Ms. Mitchell had a discriminatory animus toward employees who file EEO complaints. Specifically, Plaintiff has offered an affidavit from a co-worker, Tonino Corsetti, who was also a subordinate of Ms. Mitchell, concerning statements Ms. Mitchell made about another management employee, Liz Khamati, who had filed an EEO complaint. Mr. Corsetti's affidavit, which was

39

originally drafted as a memo used in Ms. Khamati's EEO proceedings, offers the following material information:

Mr. Corsetti was Ms. Khamati's Territory Manager from October 2000 to September 30, 2004. (# 65-2 at 2).

Mr. Corsetti was aware that Ms. Khamati had been involved in at least two other EEO complaints before the one that was the subject of this affidavit/memo. (Id.)

In response to a question asking Mr. Corsetti to describe, in chronological order, the factual events concerning Renee Mitchell directing him to demote Ms. Khamati. Mr. Corsetti stated:

> My Area Director at the time, Renee Mitchell, did not actually instruct me to fail the complainant. However, starting in the fall of 2001, she put all kinds of pressure on me to demote Ms. Khamati from her management position because she had filed an EEO Complaint and had failed to withdraw it after she was promoted to a full time manager's position. Also, Ms. Mitchell felt the complainant was creating too many problems with NTEU and sooner or later would get everybody in trouble. Since I argued that, in my opinion, Ms. Khamati was doing a good job and I had no reasons to demote her, the relationship between us became so strained she basically stopped talking to me. Therefore, when it came time for me to rate Ms. Khamati's performance for FY-2002, I did not even try to rate her anything higher than "Met." I knew that anything else would be turned down. Below please find, in chronological order, the notes I kept at the time the events took place:

(# 65-2 at 14).

> [The following is an excerpt from a memo to file that Mr. Corsetti wrote on July 10, 2002]:

> At this time, Renee asked me if I was aware of the fact that Liz had filed an EEO complaint a couple of years ago. I replied that I was aware of it, but did not know what had prompted it. Renee then asked me if Liz had

40

dropped the complaint after she had been promoted to a
permanent GS-13 position.   When I replied that I did not
know because I had never discussed the complaint with
her, Renee asked me if the idea of a manager with so
little common sense that she filed an EEO complaint
bothered me.   My response was that I could not really
comment on that because I did not know why she had filed
the complaint in the first place.

(<u>Id.</u> at 17).

[The following is an excerpt from a memo to file that Mr.
Corsetti wrote on July 18, 2002]:

After Frank and Carol, Renee started on Liz again.   She
was sure that she would definitely get all of us in
trouble unless we did something about her.   The very fact
that she had filed the EEO complaint proved this.   She
then wanted me to explain why I had not gotten rid of her
in FY-2001, when she had told me to do it, before she
went to EXD Class.

(<u>Id.</u> at 20).

[The following is an excerpt from a memo to file that Mr.
Corsetti wrote on July 22, 2002]:

I told Shirley [Ray, EEO Coordinator] that I needed to
talk to her about something that had bothered me the
whole weekend and proceeded to recount my conversations
with Renee and her obvious attempts to retaliate against
Liz for filing the EEO complaint.   Shirley's comment was
that, while she did not know what was in Renee's mind,
she thought that she (Renee) should be more careful about
what she says and whom she says it to.   She went on to
add that, a few weeks back, she (Shirley) had met Renee
in the Cafeteria and had started talking about various
subjects.   According to Shirley, Renee stated, "be ready
to receive a big EEO complaint from Liz Khamati."   When
Shirley asked Renee why she thought Liz was going to file
an EEO complaint, Renee had responded, "We are going to
take her out of management."   In view of what I had told
her about my conversations with Renee, Shirley stated
that she was going to talk to her about taking rash
actions because Liz might file a Sect. 1203 complaint for
retaliation.   She concluded that the Detroit Computing
Center had just lost a retaliation suit and had been
ordered to pay $400,000.00 to an employee.   I told her

that I would really appreciate it if she could do that
without letting Renee know that I had confided in her
(Shirley).

* * *

Late this afternoon, my colleague Jim Twisdale called me
to ask for some information about the Area 6 Re-
organization, which he is coordinating.   Since I was
still very upset about my meeting with Renee, I shared
some of my frustrations with him.  I told him that I was
particularly upset about Renee's repeated comments about
Liz's lack of common sense for filing an EEO complaint.
When I said that, Jim asked, "Did she actually say that?"
After I replied in the affirmative, Jim proceeded to tell
me that it now appeared evident that Renee had a pattern
of  retaliating  against  people  who  had  filed  EEO
complaints and went ahead to confess that he had filed a
retaliation complaint against her.   Apparently, he had
filed an EEO complaint when he was a Branch Chief in
Indiana and Renee had not forgiven him for it.

(Id. at 21-22).

Plaintiff argues that this evidence, in combination with the

facts that, (1) after substantial delays, Ms. Mitchell had to be

ordered to respond both to Plaintiff's initial grievances and the

grievance examiner's report, and (2) the consistent pattern by Ms.

Mitchell and other agency officials, of dismissing or ignoring

Plaintiff's requests for resolution of the grievances, "support

either direct or circumstantial evidence of a discriminatory

animus." (Id. at 30).

Defendant acknowledges a number of errors in the processing of

Plaintiff's grievances, but denies that the errors amount to

discrimination or retaliation.  (# 64 at 6).  Defendant asserts

that persons other than Ms. Mitchell were involved in the process

42

of resolving Plaintiff's grievances and that there is no evidence

that those other actors were "motivated by discriminatory animus."

(Id.)  Defendant specifically asserts:

> Importantly, the Grievance Examiner, an objective
> party to at least part of the events, did not find that
> there was a discriminatory animus that had affected the
> grievance process.  Rather, he concluded, as Defendant
> has explained, that the agency was hoping for a global
> resolution which would include the grievances and
> Plaintiff's EEO claims.  Despite Plaintiff's concern that
> he was disadvantaged by this approach to disposing of the
> matters, there is certainly nothing inappropriate in
> attempting an amicable global resolution which often
> saves the parties' resources.

(Id. at 6-7).   Addressing Mr. Corsetti's affidavit, Defendant

states:

> First and foremost, Defendant points out that these
> memoranda do not discuss Plaintiff or his grievances and
> therefore do not assist him in proving discriminatory
> animus with regard to the processing of his grievances.
> Furthermore, Defendant submits that a clear reading of
> these documents reveals that Ms. Mitchell took issue with
> Ms. Khamati's performance, nothing more.   Part of Ms.
> Khamati's performance deficiencies involved her apparent
> inability to lead without generating numerous grievances.
> Defendant submits that evaluating a manager based upon
> the number of grievances he or she generates is not
> improper or uncommon.   The memoranda further reveal that
> Mr. Corsetti does not completely disagree with Ms.
> Mitchell's assessment of Ms. Khamati's performance but
> that he is willing to give Ms. Khamati additional time to
> improve.

> These alleged facts simply do not establish a
> discriminatory bias by Ms. Mitchell.  Furthermore, while
> Defendant does not concede the allegation that Ms.
> Mitchell implicitly opined that Ms. Khamati lacked common
> sense as demonstrated by her filing an EEO Complaint,
> this statement, even if true, is nothing more than an
> offhand remark, regarding Ms. Mitchell's lack of
> confidence in Ms. Khamati's intellect and management
> skills.   At worst, Ms. Mitchell expressed surprise that

43

a management employee had cause to file an EEO Complaint.

Finally, Mr. Corsetti's memoranda demonstrate a clear animosity for Ms. Mitchell and her management style which cannot be attributed to a concern that she is acting improperly. Consequently, Defendant submits that a critical reading of these documents is in order.

(Id. at 7-8).

Defendant further asserts that Plaintiff's attempt to "parse out" each and every explanation by Defendant for the delay in processing Plaintiff's grievances is "disingenuous," and that Plaintiff's case is "far more complicated" than for lower level employees filing grievances. (# 64 at 8). Defendant contends that the court must look at the circumstances as a whole, and take into consideration that Plaintiff was a high-level management employee.

Specifically, Defendant states:

Defendant has offered that upon filing his grievances, Plaintiff's situation was somewhat unique within the agency. There was a host of factors which complicated his situation. Specifically, the agency grievance procedures require that the management individuals who review an employee's grievance be superior to that employee in the agency's management hierarchy. Plaintiff was a high level member of management when he filed the grievances. Consequently, designating a Level 1 and Level 2 official was more problematic than it might have been with a lower level employee. Furthermore, Plaintiff filed various other complaints with the agency, some of which caused the grievances to be stayed (TIGTA investigation)[footnote omitted]. The agency then underwent restructuring, further complicating the management hierarchy. Plaintiff transferred jobs during this time also. Added to this already complicated background was Ms. Mitchell's appointment to her new Area 6 management position - only to be assigned Plaintiff's five grievances as she came on board.

44

> Ms. Mitchell has never contended that she did not
> have a waking moment in which she could have responded to
> Plaintiff's grievances.  Rather, she has offered a list
> of   other   duties   and   responsibilities   which   she
> prioritized over them. ***

(Id. at 9).  Defendant then asserts:

> Ultimately, Plaintiff does not demonstrate that any of
> the reasons offered to explain the delay were false.
> Rather, he simply claims none of them were good enough  –
> in his opinion.  It is not the purpose of the Court to
> second guess the agency in its management efforts.  The
> agency clearly failed in its handling of Plaintiff's
> grievances.   However, there simply is not sufficient
> evidence from which a trier of fact could determine that
> Ms. Mitchell, as well as other involved management
> officials,  delayed  the  processing  of  Plaintiff's
> grievances for the purpose of discriminating against him
> for prior EEO activity.

(Id. at 10).

The fact remains that it took almost two years for the
resolution of Plaintiff's grievances.   Ms. Mitchell had to be
ordered to respond to both the grievances themselves and the
grievance examiner's report.  Whether Ms. Mitchell's comments about
another management employee filing an EEO complaint indicate a
discriminatory animus, and whether the reasons for the delays
offered by the Defendant are a pretext, are questions appropriately
decided by a jury.

Based upon all of this evidence, the undersigned proposes that
the presiding District Judge **FIND** that there is evidence from which
a reasonable trier of fact could find that the delay in processing
Plaintiff's grievances was motivated by Renee Mitchell's
retaliatory   animus   for   Plaintiff's   prior   EEO   activity.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is a genuine issue of material fact concerning whether the reasons proffered by Defendant for the delay in processing Plaintiff's grievances are a pretext for retaliation, due to Plaintiff's EEO activity, and that Defendant is not entitled to judgment as a matter of law on Plaintiff's retaliation claim.

Therefore, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** Defendant's Motion for Summary Judgment (# 57), and set this case down for a jury trial.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have ten days (filing of objections) and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of this Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a

46

waiver of appellate review by the Circuit Court of Appeals.  Snyder
v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S.
140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United
States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  Copies of such
objections shall be served on opposing parties, Judge Copenhaver,
and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and
Recommendation and to mail a copy of the same to the plaintiff and
counsel of record.

August 27, 2007
            Date

Mary E. Stanley
United States Magistrate Judge